IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD TOWNSEND, | ) | Case No. 1:17-cv-2218 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

## I.     Introduction

Plaintiff, Edward Townsend, seeks judicial review of the final decision of the

Commissioner of Social Security denying his application for supplemental security income under

Title XVI of the Social Security Act ("Act").  The parties consented to my jurisdiction.  ECF

Doc. 13.  Because the ALJ's failed to support her Step Five decision by substantial evidence, and

because she failed to follow the agency's treating physician rule, the final decision of the

Commissioner must be VACATED and the claim REMANDED for further proceedings.

## II.     Procedural History

Townsend protectively applied for supplemental security income on May 12, 2014.  (Tr.

77)  After his claim was denied initially (Tr. 109-111) and on reconsideration (Tr. 116-117),

Townsend requested a hearing.  (Tr. 118-120)  Administrative Law Judge ("ALJ") Susan G.

Giuffre heard the case on July 27, 2016 (Tr. 34-71), and found Townsend not disabled in a

September 12, 2016 decision.  (Tr. 14-29)  Townsend requested review of the ALJ's decision on

September 20, 2016.  (Tr. 151)  The Appeals Council denied review on August 22, 2017 (Tr. 1-3), rendering the ALJ's decision final.  Townsend initiated this action to challenge the Commissioner's final decision.

## III.  Evidence

### A.  Personal, Educational and Vocational Evidence

Edward Townsend was born on March 15, 1967 and was forty-seven years old when he applied for supplemental security income.  (Tr. 154)  He did not graduate from high school and was unable to get his GED.  (Tr. 38)  He had no past relevant work experience.  (Tr. 41, 176, 26)

### B.  Relevant Medical Evidence for Mental Impairments[1]

On August 22, 2012, Townsend sought mental health services.  He reported losing consciousness when he hit his head on a curb at six or seven years old.  (Tr. 241, 252) Townsend was described as a poor historian and was unable to tell the time on an analog clock.  (Tr. 252-253)  He also reported being unable to write a letter or read the newspaper.  (Tr. 253)

Townsend met with Maria Obias, a clinical nurse specialist, for a psychiatric evaluation on March 7, 2014.  (Tr. 266-270)  Townsend reported anxiety, depression, hyperactivity, bad temper, and hallucinations.  (Tr. 266)  He told Ms. Obias that he was in special education classes from junior high until part of the 12th grade.  He could not remember much of the past.  (Tr. 266)  He reported suffering a head trauma when he was ten years old.  (Tr. 267)  He said that he had received intermittent mental health care while in prison from 1989-2012.  (Tr. 266, 268)  Ms. Obias assessed major depressive disorder, recurrent, severe without psychotic features and she prescribed Prozac.  (Tr. 268)

---

[1] Townsend also has physical impairments but, because they are unrelated to his appeal, the court has not included a summary of those impairments.  (Tr. 17-18)

Townsend missed a follow-up appointment with Ms. Obias on March 18, 2014. (Tr. 272) On May 6, 2014, he reported having less depression, anxiety, paranoid thoughts, and visual hallucinations. (Tr. 273) Ms. Obias continued Townsend's Prozac prescription. (Tr. 274) Townsend missed appointments with Ms. Obias in June and July 2014. (Tr. 275, 276)

On September 16, 2014, Townsend reported anger, depression and irritability. He had lost some of the pain medication he received. Ms. Obias continued Townsend's Prozac prescription and contacted a care coordinator about his lost medication. (Tr. 346)

Townsend missed or rescheduled appointments with Ms. Obias in October 2014, December 2014, and January 2015. (Tr. 347, 348, 349) On January 21, 2015, Townsend told Ms. Obias that he had not taken Prozac for two weeks and had increased racing thoughts, anger, anxiety, depression, hallucinations and paranoid thoughts. He reported head trauma years ago when he fell and hit his head on a parked car. (Tr. 350) Townsend began meeting with a licensed social worker in February 2015. (Tr. 382, 383-389, 392-395, 397-400, 402-409, 413-414, 416-417, 420-423)

On February 19, 2015, Townsend continued to complain to Ms. Obias about severe depression, anxiety, insomnia, auditory and tactile hallucinations, paranoid thoughts, poor memory, impaired attention and concentration, and labile effect due to not taking his medication consistently. (Tr. 390) Ms. Obias referred Townsend to medication monitoring every two weeks. (Tr. 391, 396, 401, 412, 418, 424)

On February 24, 2015, a social worker accompanied Townsend to a medical appointment for arthritis pain. Townsend requested that the social worker attend the appointment because he had concerns about communicating to the provider. (Tr. 393) At the appointment, a nurse practitioner noted that Townsend was a poor historian and had some cognitive impairment. (Tr.

356-358)  On March 27, 2015, Townsend told Ms. Obias, among other complaints, that he was having mood swings, impaired attention and concentration, and paranoid thoughts.  Ms. Obias increased his Prozac dosage.  (Tr. 410-411)

From May through early July 2015, Townsend missed several appointments with Ms. Obias and his caseworker.  (Tr. 425, 427, 428, 429, 430, 431, 432)  On July 24, 2015, Townsend reported that he had not taken his medication for four weeks and had an increase in mental impairment symptoms.  (Tr. 434)  Ms. Obias restarted Prozac and referred Townsend back to his caseworker.  (Tr. 435)

On August 31, 2016, Townsend reported to a nurse that he had not had medication for four months.  He had been having a lot of pain and increased mental impairment symptoms.  The nurse educated Townsend about medication and helped him schedule pill reminders.  (Tr. 437)

Townsend missed several appointments in September 2015.  (Tr. 450, 451, 458)  At a medication management appointment on September 14, 2015, Townsend stated that he was taking his medications and was not having any side effects.  (Tr. 452)

Townsend met with a caseworker twice in September 2015 (Tr. 454, 457), but then missed his next two appointments.  (Tr. 460, 464)  In November 2015, his caseworker noted that he had not gone to the pharmacy to pick up his prescriptions since late September.  (Tr. 459)

On January 8, 2016, Townsend began treating with nurse practitioner, Julia Veres.  (Tr. 466-467)  Townsend reported headaches, depression, anxiety, and psychotic episodes after running out of medication.  Ms. Veres diagnosed major depressive disorder with psychotic features or schizoaffective disorder.  She increased his Prozac dosage and prescribed anti-psychotic medication.  (Tr. 467)

On January 21, 2016, a nurse practitioner noted that Townsend was a "Poor historian. Mumbles. Flat affect." (Tr. 440)

Townsend continued to meet with his caseworker. (Tr. 473, 474, 475, 477, 478) On May 17, 2016, Townsend told Ms. Veres that his current medications were helping somewhat, but he had run out of them. (Tr. 470-471) Ms. Veres observed that Townsend was calm, well-groomed, dressed appropriately, and had a pleasant subdued demeanor. (Tr. 470) She noted that cognitive deficits were evident, likely secondary to severe traumatic brain injury. (Tr. 471) Ms. Veres restarted Townsend's medications. (Tr. 471)

On May 19, 2016, Townsend reported difficulties comprehending and understanding. He had a friend who helped him pay his rent and bills. (Tr. 473) On June 6, 2016, a caseworker noted that Townsend had difficulties speaking and it was difficult to understand his speech at times. (Tr. 478)

C.     **Opinion Evidence**

1.     **Treating Physician Cathleen Cerny, M.D., September 2014**

Cathleen Cerny, M.D., worked in conjunction with Maria Tobias, CNS, to provide psychological treatment to Townsend starting on March 7, 2014. Dr. Cerny completed a mental status questionnaire on September 16, 2014. Dr. Cerny noted that Townsend's appearance was generally clean and neat and that he had good hygiene. He had slow and pressured speech, a depressed, angry and irritable mood, and his affect was labile. Townsend reported visual hallucinations and paranoid thoughts. Dr. Cerny opined that Townsend's memory was fair to good and his concentration was not impaired. He knew that he was mentally ill and needed treatment. He had received counseling in addition to medications. (Tr. 305)

Dr. Cerny diagnosed major depressive disorder, recurrent, severe with psychotic features. She noted that Prozac was beginning to be effective on Townsend's symptoms and he did not suffer any side effects. Dr. Cerny did not believe that Townsend was capable of managing any benefits. She opined that he could remember brief instructions and maintain attention for less than 30 minutes. He might be able to complete short and simple tasks in a timely fashion. He could not tolerate much social interaction and might have difficulties with adaptation and coping with extreme pressure. (Tr. 306)

### 2. Consultative Psychological Exam – Michael Faust, Ph.D. – September 2014

Townsend underwent a consultative psychological examination by Michael Faust, M.D., on September 19, 2014. (Tr. 296-302) Townsend reported low energy, poor sleep, and some homicidal ideation. He claimed that he had never experienced hallucinations, delusions, paranoid ideation or obsessive thought processes. (Tr. 298)

Townsend reported that he was in special education classes and had been diagnosed as emotionally disturbed. He received C's and D's and had to repeat one grade in junior high school. He dropped out of school in the 11th grade because he went to prison. He took the GED test three times but never passed. (Tr. 297) Dr. Faust observed that Townsend could track conversations without difficulty but gave curt responses to questions. He could follow complex instructions, but gave up quickly on tasks. (Tr. 299-300)

On cognitive testing, Townsend completed simple mathematical problems in his head but could not answer more difficult problems such as 20/4. He repeated six digits forward and three digits backward. He understood complex instructions, including serial 7's, but he made a mistake after two numbers and refused to try again. (Tr. 300)

Dr. Faust diagnosed major depressive disorder and an unspecified personality disorder with antisocial traits. (Tr. 300) He opined that Townsend's overall cognitive or intellectual functioning was in the average range. Townsend did not exhibit any difficulty in understanding instructions and had no lapses in attention or memory. Due to antisocial traits, Townsend was limited in responding to supervisors or co-workers. (Tr. 301) He was mildly limited in responding to work pressures. (Tr. 301-302)

### 3.    State Agency Reviewing Psychologists

Tonnie Hoyle, Psy.D., reviewed Townsend's records on October 23, 2014. (Tr. 86-88) She opined that Townsend was moderately limited in his ability to understand and remember detailed instructions, but could carry out simple, routine tasks. (Tr. 87) She opined that he could interact with others on an occasional or superficial basis and could adapt to occasional changes with some supervisory support. (Tr. 88)

On March 11, 2015, Ermias Seleshi, M.D., reviewed Townsend's records and noted that he did not allege any new or worsening mental impairments but that the records reflected that he had increased symptoms when he did not take his medication. (Tr. 105) Dr. Seleshi agreed with the opinions expressed by Dr. Hoyle. (Tr. 103-105)

### D.    Testimonial Evidence

### 1.    Townsend's Testimony

Townsend testified at the administrative hearing on July 27, 2016. (Tr. 38-55) He did not graduate from high school and could not obtain his GED. (Tr. 38) He never held a job for any significant period. He worked for various temporary agencies. (Tr. 41) He quit a cleaning job at a factory because his back and shoulder hurt and he got into an argument with a supervisor after cutting his hand. (Tr. 43-44)

Townsend lived alone but a friend helped him with cooking, cleaning and showering. (Tr. 48)  Townsend had been using a cane for walking for two years.  (Tr. 46)  He thought he would be able to stand for about 30 minutes before his knees and back would hurt.  (Tr. 52-53)  Townsend had suffered a traumatic brain injury.  (Tr. 52, 55)  Medication helped a little.  (Tr. 44)

## 2. Vocational Expert's Testimony

Vocational Expert ("VE") Gail Klier was asked to consider an individual of Townsend's age, education and lack of past relevant work; with the physical capacity for light work with standing and walking four out of eight hours; sitting six out of eight hours; with the ability to push and pull with the left lower extremity occasionally; the ability to push or pull with the right lower extremity frequently; the ability to climb ramps and stairs occasionally; but he could never climb ladders, ropes or scaffolds; he could frequently balance; occasionally stoop, kneel, crouch, but never crawl; and the ability to work in a static work setting without demand for fast pace or high production; to interact on an occasional and superficial basis; and to adapt to occasional changes.  (Tr. 56-57)

The VE testified that this individual could work as a tanning salon attendant, as a cleaner/housekeeper, and as a house sitter.  (Tr. 57)  However, when questioned by Townsend's attorney, the VE admitted that, based on her experience, an individual who needed to sit four out of eight hours could not perform the job of cleaner/housekeeper.  Regarding the house sitter job, the VE acknowledged that the hypothetical individual could not perform this job as it is described by the DOT.  However, based on her experience, she felt that it could be performed. (Tr. 61-62)  She opined that there were less of these jobs available than indicated by the DOT. (Tr. 63)  She also testified that a person could not perform the job of house sitter if the person

required supervisory support.  (Tr. 66)  Nor could the person perform the job of tanning salon

attendant if he required supervisory support to deal with occasional changes.  (Tr. 68)  Finally,

the VE said that an individual who could only pay attention for 30 minutes at a time, and then

needed a 5 minute break, would require an accommodation in order to work.  (Tr. 69)

## IV.    The ALJ's Decision

The relevant portions of the ALJ's decision (Tr. 14-29) are paraphrased below[2]:

4.      Townsend had the residual functional capacity to perform light work
except he could stand or walk for four hours of an eight-hour workday; he
could sit for six hours of an eight-hour workday; he could push and pull
with the left lower extremity and frequently push and pull with the right
lower extremity;  he could occasionally climb ramps or stairs; he could
never climb ladders, ropes or scaffolds; he could frequently balance; he
could occasionally stoop, kneel, or crouch; he could never crawl; he could
perform simple, routine tasks; he could work in a static setting without
demands for fast pace or high production; he could interact on an
occasional and superficial basis with others; he could adapt to occasional
changes.  (Tr. 20-26)

9.      Considering Townsend's age, education, work experience, and residual
functional capacity, there were jobs that existed in significant numbers in
the national economy that he could perform.  (Tr. 26)

Based on her ten findings, the ALJ determined that Townsend had not been under a disability

since May 12, 2014, the date his SSI application was filed.  (Tr. 28)

## V.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker,* 708

F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla

---

[2] The court includes only those findings relevant to the issues Townsend has raised.

of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not

build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step Four, the Commissioner determines whether the claimant can still perform his past relevant work; and finally, at Step Five, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

**B.     Substantial Evidence Did Not Support the ALJ's Step Five Finding**

Townsend argues that the ALJ didn't satisfy the Step Five burden: showing that jobs existed in the national economy that Townsend could perform.  ECF Doc. 14 at Page ID# 548-554.  The ALJ relied on the VE's testimony that someone with Townsend's RFC would be able to perform the jobs of cleaner/housekeeper, tanning salon attendant, and house sitter.  However, when challenged by Townsend's attorney, the VE modified her opinions.  Townsend contends that the ALJ did not fulfill her responsibility to resolve the conflicts created by the VE's testimony.  Consequently, he argues, she did not meet her burden at Step Five to show that a significant number of jobs existed that he could perform.  Townsend further contends that the VE's error was not harmless because she should have resolved the issues and explained them in her decision.

The Commissioner concedes that Townsend could not perform the job of cleaner/housekeeper, as the VE admitted on cross-examination.  ECF Doc. 15 at Page ID# 587.  The Commissioner also recognizes that the tanning salon attendant job is not listed in the DOT.  *Id.*  But, the Commissioner defends the VE's opinion that Townsend could perform the job of house sitter.  ECF Doc. 15 at Page ID# 587-590.  The Commissioner argues that Townsend was capable of the reasoning level required for that job and that he could perform most examples of that job, as opined by the VE.  The Commissioner acknowledges the VE's admission that there were less than 67,000 house sitter jobs Townsend could perform, but argues that there were still a significant number of these jobs.  In short, the Commissioner contends that the ALJ met her burden at Step Five and properly explained her decision.

Under the fifth step of the sequential evaluation, ALJs may consider "'reliable job information' available from various publications" as evidence of the claimant's ability to do other work "that exists in the national economy." SSR 00-4p, 2000 SSR LEXIS 8, at *3, 2000 WL 1898704 at *2 (Dec. 4, 2000) (citing 20 C.F.R. §§ 404.1566(d) and 416.966(d)). Such publications include the DOT, which provides "information about jobs (classified by their exertional and skill requirements) that exist in the national economy." 20 C.F.R. § 416.969. ALJs may also consider the testimony of vocational experts as a source of occupational evidence. S.S.R. 00-4p, 2000 SSR LEXIS 8, at *3, 2000 WL 1898704 at *2. *See also Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009).

SSR 00-4p, 2000 SSR LEXIS 8 sets forth "the actions required of an ALJ when there is an apparent conflict between the testimony of the vocational expert and the DOT." *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006). In pertinent part, SSR 00-4p, 2000 SSR LEXIS 8 provides:

> [B]efore relying on VE . . . evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between the occupational evidence provided by the VEs . . . and information in the [DOT], including its companion publication, the Selected Characteristics of Occupations...and Explain in the determination or decision how any conflict that has been identified was resolved.

SSR 00-4p, 2000 SSR LEXIS 8, at *1, 2000 WL 1898704 at *1 (SSA Dec. 4, 2000). Significantly, SSR 00-4p, 2000 SSR LEXIS 8 imposes an "affirmative responsibility" on ALJs to ask about any possible conflicts between the VE testimony and information provided in the DOT. See S.S.R. 00-4p, 2000 SSR LEXIS 8, at *4, 2000 WL 1898704, at *2, *4; ("[VE testimony] should be consistent with the occupational information supplied by the DOT...the adjudicator will inquire, on the record, as to whether or not there is such consistency.") *See also Lindsley*, 560 F.3d at 606. Neither the testimony of a VE nor the occupational descriptions in the

DOT necessarily trumps the other. *Ledford v. Astrue,* 311 F. App'x 746, 757 (6th Cir. 2008).

However, if there appears to be a conflict with the DOT, the ALJ must obtain a "reasonable

explanation" for the apparent conflict and, further, must "explain in the determination or decision

how he or she resolved the conflict." SSR 00-4p, 2000 SSR LEXIS 8, at *9, 2000 WL 1898704

at * 4. SSR holdings "are binding on all components of the Social Security Administration [and]

represent precedent final opinions and orders and statements of policy and interpretations that

[have been] adopted." 20 C.F.R. § 402.35(b)(1). *See also Lancaster v. Comm'r of Soc. Sec.,* 228

F. App'x 563, 573-574 (6th Cir. 2007).

Here, the VE opined that Townsend could perform three different jobs and that those jobs

represented "a fairly exhaustive list." (Tr. 57) She then acknowledged that her opinion

testimony was inconsistent with the DOT. (Tr. 57, 61-68) She actually removed the job of

cleaner/housekeeper because it required more standing than Townsend's RFC permitted. (Tr.

57) Regarding the house sitter job, the VE stated that her "opinion differs from the DOT,

because not all these duties are necessarily performed as the DOT describes it." (Tr. 61) And

the tanning salon attendant job did not appear in the DOT. (Tr. 66) The ALJ was aware of the

inconsistencies between the VE's testimony and the DOT.

The ALJ acknowledged that the VE had removed the cleaner/housekeeper job from her

initial opinion. (Tr. 27) The ALJ rejected Townsend's assertion that the need for supervisory

support would have eliminated the tanning salon attendant and house sitter jobs, because the

claimant had worked in the past and had done community service without the need for

supervision. (Tr. 28) Further, regarding the house sitter job, the ALJ stated:

> * * * the claimant's representative noted the DOT indicates such person could
> conduct necessary business transactions and asked the VE whether these
> transactions would include paying bills. The VE replied in the negative stating
> the house sitter just stays in the house when the owners are not there. In reply to

further inquiry by the representative, the VE noted that this job is not customarily performed continuously in one place but the individual would go from one job to another to perform these duties. The representative asked whether moving from job to job would constitute a "static setting" as required in the hypothetical. The VE responded that going from place to place is not a duty of the job and that the job itself is essentially static in the required duties involved. Accordingly, the undersigned finds this assertion of the representative is not well founded.

(Tr. 27-28)

The ALJ then acknowledged her responsibility to "determine whether work exists in significant numbers and to resolve any conflicts in the occupational information provided by the vocational expert." (Tr. 28) Then the ALJ concluded by stating:

> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. The undersigned accepts [the VE's] testimony as being consistent with the evidence because it is based on her professional experience and because it is consistent with the DOT and with the SCO.

> Based on [the VE's] testimony, the undersigned concludes that, considering the claimant's age, education, work experience and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

(Tr. 28) The ALJ openly acknowledged inconsistencies between the VE's testimony and the DOT. She acknowledged her responsibility to resolve those conflicts. But then, she simply stated that the VE's testimony was consistent with the evidence and the DOT. But it wasn't; and the ALJ never explained how she resolved the inconsistencies.

However, "a violation of SSR 00-4p, 2000 SSR LEXIS 8 does not automatically require remand." *Harrington v. Comm'r of Soc. Sec.*, 2015 U.S. Dist. LEXIS 120567, 2015 WL 5308245 at * 7 (N.D. Ohio Sept. 10, 2015). *See also Miller v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 15097, 2012 WL 398650 at * 15 (N.D. Ohio Feb. 7, 2012); *Bratton v. Astrue,* 2010 U.S. Dist. LEXIS 72752, 2010 WL 2901856 at * 4 (M.D. Tenn. July 19, 2010); *Fleeks v. Comm'r of Soc. Sec.*, 2009 U.S. Dist. LEXIS 59539, 2009 WL 2143768 at * 7 (E.D. Mich. July

13, 2009).  For example, an ALJ's failure to inquire about an inconsistency with the DOT may

constitute harmless error when there is no conflict between the VE's testimony and the DOT.

*See Joyce v. Comm'r of Soc. Sec.*, 662 F. App'x 430, 436 (6th Cir. 2016) ("[A]n ALJ's failure to

inquire about a nonexistent conflict is necessarily harmless ...."); *Johnson v. Comm'r of Soc. Sec.*,

535 F. App'x 498, 508 (6th Cir. 2013) (citing *Poppa v. Astrue*, 569 F.3d 1167, 1174 (10th Cir.

2009) ("finding 'the ALJ's error in not inquiring about potential conflicts [to be] harmless'

[when] no conflicts existed between the VE's testimony and the DOT's job descriptions")).

   Here, the ALJ's error was not harmless.  The Commissioner concedes that Townsend

could not perform the cleaner/housekeeper job.  The Commissioner also concedes that the

tanning salon attendant job was not in the DOT.  Thus, the only job consistent with the DOT that

could have satisfied the ALJ's burden at Step Five was the house sitter job.  But the VE testified

that her opinion differed from the DOT.  For example, she acknowledged that the house sitter job

description included an individual's ability to pay current bills from designated funds.  (Tr. 62)

But Townsend's treating physician, Dr. Cerny, opined that he would not be able to manage even

his own funds if they were awarded.  (Tr. 306)  Medical records from Townsend's case worker

also showed that Townsend was not paying his own bills.  (Tr. 473)  It is hard to understand how

Townsend would have been able to pay someone else's bills when he could not pay his own.

   The VE also admitted that there would be fewer than 67,000 house sitter jobs available

for someone like Townsend (the number she had originally opined).  But the ALJ never

determined how many fewer.  (Tr. 62-63)  The Commissioner argues that the VE testified that

Townsend could perform "most" of the house sitter jobs.  ECF Doc. 15 at Page ID# 589.  But

this is not apparent from the VE's testimony.  She testified that she was not following the DOT's

description of house sitter (Tr. 58, 61)  And she testified that there would be "some jobs, albeit

16

not as many as one would think," (Tr. 68) and that there would be "less" than 67,000. (Tr. 63)
The ALJ did not resolve the conflicts between the VE's testimony and the DOT. Nor did she
explain how she "resolved" the inconsistencies. And, because this was the only job from the
DOT that Townsend could possibly have performed, it was not harmless error for the ALJ to fail
to resolve the conflicts or even to clarify the VE's opinion on how many house sitter jobs would
actually be available. The court agrees with Townsend that the ALJ's decision at Step Five was
not supported by substantial evidence. For this reason, this case must be remanded.

### C.    Whether the ALJ Properly Analyzed the Treating Physician Opinion[3]

Townsend also argues that the ALJ failed to assign the proper weight to his treating
physician's opinions, and failed to state good reasons for assigning less than controlling weight
to Dr. Cerny's opinions. The administrative regulations implementing the Social Security Act
impose standards for weighing medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th
Cir. 2011). In making disability determinations, an ALJ must evaluate the opinions of medical
sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r
of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n
ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-
supported by medically acceptable clinical and laboratory diagnostic techniques and not
inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc.
Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation
marks omitted).

Even if the ALJ does not give the opinion controlling weight, the treating source opinion
is still entitled to significant deference or weight that takes into account the length of the

---

[3] 20 CFR §§ 416.927 applies to Townsend's claim because it was filed before March 27, 2017.

treatment and frequency of the treatment relationship, the supportability of the opinion, the

consistency of the opinion with the record as a whole, and whether the treating physician is a

specialist. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain how she

considered each of these factors but must provide "good reasons" for discounting a treating

physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938. ("In addition to

balancing the factors to determine what weight to give a treating source opinion denied

controlling weight, the agency specifically requires the ALJ to give good reasons for the weight

actually assigned.")

The ALJ's "good reasons" must be "supported by the evidence in the case record, and

must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996

WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> [t]he conflicting substantial evidence must consist of more than the medical
> opinions of the nontreating and nonexamining doctors. Otherwise the treating
> physician rule would have no practical force because the treating source's opinion
> would have controlling weight only when the other sources agreed with that
> opinion. Such a rule would turn on its head the regulation's presumption of
> giving greater weight to the treating sources because the weight of such sources
> would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.

A failure to follow these procedural requirements "denotes a lack of substantial evidence,

even [when] the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r

of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not

hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given

to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions

from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661

F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original)

(internal quotation marks omitted).

Regarding Dr. Cerny's opinion the ALJ stated:

> As for the opinion evidence, Cathleen Cerny, M.D., completed a Mental Status Questionnaire on September 18, 2014 (Exhibit C5F). The claimant was first seen on March 7, 2014 and she was last seen on September 16, 2014. He was generally clean and neat with good hygiene. His speech was slow and pressured. His mood was depressed, he was angry and irritable, and his affect was labile. The claimant denied anxiety but during visits he was noted to have moderate anxiety. He had auditory and visual hallucinations and paranoid thinking. He was oriented to time, place and person. His memory was fair to good and his concentration was not impaired. He denied using alcohol and illicit drugs. The claimant was diagnosed with major depressive disorder, recurrent, severe with psychotic features. He has symptoms of depression, anxiety and psychosis. He has no side effects from medications. The claimant can remember brief instructions. He can maintain attention for less than 30 minutes at a time. Social interaction is limited. Multiple stressors may cause the claimant's symptoms to become worse. The undersigned assigned great weight to this opinion because it is from the claimant's psychiatric treating source and the limitations and diagnoses are consistent with the overall medical evidence.

(Tr. 24)

The ALJ did not follow the agency's treating physician rule. She said she assigned "great

weight" to Dr. Cerny's opinion, but she was required to assign controlling weight or to explain

why she didn't. Great weight is not controlling weight. And the ALJ did not clearly incorporate

all of the limitations opined by Dr. Cerny.[4] For example, Dr. Cerny opined that Townsend could

maintain attention for less than thirty minutes at a time. The ALJ's RFC determination did not

---

[4] Rather than incorporating the opinions expressed by Dr. Cerny into the RFC, the ALJ appears to have incorporated most of the limitations opined by the state agency reviewing physicians. (Tr. 21, 25) However, the ALJ even omitted some of the state agency reviewer's opinions without explanation. The reviewing physicians opined that Townsend could adapt to changes *with supervisory support.* (Tr. 25) But, the ALJ omitted "supervisory support" from the RFC. This is significant because the VE testified that Townsend would not be able to perform the job of house sitter if he required supervisory support for changes. (Tr. 65-66)

incorporate that limitation. The Commissioner argues that the ALJ accounted for Townsend's reduced attention and concentration by limiting him to simple, routine tasks. But, her RFC did not indicate that Townsend was limited to tasks that could be completed in less than thirty minutes. And this is significant because the VE testified that Townsend would require a special accommodation if he needed to take five minute breaks after working for thirty minutes. (Tr. 69) Substantial evidence may have supported the ALJ's rejection of this specific limitation expressed by Dr. Cerny and/or the VE's related opinion. However, the ALJ did not explain why she apparently chose to incorporate parts of Dr. Cerny's opinion in her RFC while rejecting other parts. By failing to assign controlling weight to Dr. Cerny's opinions and by failing to state good reasons for omitting some of the limitations expressed in that opinion, the ALJ failed to follow the agency's treating physician rule.

The Commissioner seemingly concedes that the ALJ did not assign controlling weight to Dr. Cerny's opinion when she argues that the ALJ "properly harmonized" all of the medical opinions. ECF Doc. 15 at Page ID# 593. Harmonizing the medical opinions would make sense if the agency's treating physician rule did not apply to Townsend's claim. But it did. The court agrees with Townsend that the ALJ erred by failing to assign controlling weight to Dr. Cerny's opinions and by failing to provide any explanation, let alone good reasons, for assigning less than controlling weight to her opinions.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion is harmless error. These circumstances arise when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the

procedural safeguard of reasons – even though she has not complied with the terms of the regulation. "*Wilson,* 378 F.3d at 547. *See also Cole,* 661 F.3d at 940. In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Nelson v. Comm'r of Soc. Sec.,* 195 F. App'x 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 F. App'x 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 F. App'x at 551.

Here, the ALJ erred by assigning "great weight" to *all* of the medical opinions without clearly incorporating the limitations opined by Townsend's treating physician. The ALJ's decision does not reveal whether the she fully considered the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6) including whether the medical evidence in the record as a whole supported Dr. Cerny's opinions. The ALJ's failure to provide "good reasons" for assigning less than controlling weight to Dr. Cerny's opinion regarding Townsend's limitations was not harmless error. Even if good reasons existed to reject portions of the treating physician's opinion, the ALJ failed to articulate those reasons to allow for meaningful review. The ALJ failed to follow the agency's regulation and this case must be remanded for proper analysis of Townsend's treating physician's opinion.

**D.      Whether the ALJ was Required to Order Intelligence Testing**

Finally, Townsend contends that the ALJ erred by failing to fully develop the record by ordering IQ testing, as requested by Townsend's representative.  ECF Doc. 14 at Page ID# 558-560; (Tr. 69).  The Commissioner argues that there was sufficient evidence in the record for the ALJ to consider Townsend's intellectual abilities.  As an example, the Commissioner cites Dr. Faust's opinion stating that Townsend's overall cognitive or intellectual functioning was viewed in the average range.  (Tr. 301)

An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary.  20 C.F.R. §§ 404.1517 , 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.") (emphasis added); *see Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.")

Here, there was evidence in the record regarding Townsend's intellectual abilities.  The ALJ did not abuse her discretion by declining to order intelligence testing.  See 20 C.F.R. § 404.1519a; *Culp v. Comm'r of Soc. Sec,* 529 F. App'x 750, 751, citing *Foster v. Halter*, 279 F.3d 348, 355-56 (6th Cir. 2001).  And, because counsel represented Townsend, the ALJ did not have a special duty to develop the record.  *See Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 856 (6th Cir. 1986).  Townsend's final argument is not well taken and the court does not order remand on this basis.

## VI.    Conclusion

Because the ALJ's decision at Step Five was not supported by substantial evidence and because she failed to follow the agency's treating physician rule, the final decision of the Commissioner is VACATED and remanded for further proceedings consistent with this order.

IT IS SO ORDERED.


Dated: November 6, 2018

Thomas M. Parker
United States Magistrate Judge